## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| JOSEPH DRAEGO, | ) | |
| *Plaintiff,* | ) | CASE NO. 3:16-CV-00057 |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| CITY OF CHARLOTTESVILLE, VIRGINIA, | ) | |
| | ) | By: Norman K. Moon |
| *Defendant.* | ) | United States District Judge |

The Charlottesville City Council ("Council"), in an effort at responsive government, holds "matters by the public" periods at its meetings, during which a citizen can speak for three minutes on essentially any topic he wants. The subject-matter of this period is unlimited and unrelated to the meeting's agenda: As conceded at oral argument, people can "talk about totally irrelevant matters if they want to" that "may not even relate to the City." Despite this breadth, the Council's rules prohibit seven topics or types of speech during public comment periods. The rule challenged here bans speakers from making "defamatory attacks on groups."

Plaintiff Joseph Draego is a local citizen who asserts that allegedly unfettered Muslim immigration into his hometown poses a public safety risk. He attempted to share his views with the Council on June 20, 2016. After first stating that many Muslims were good people, Plaintiff later, in explaining his anti-immigration view, said Muslims were "monstrous maniacs" who perpetrate "horrible crimes." Citing the Council's group defamation rule, the Mayor (who presides over Council meetings) called for and received a vote to cut off Plaintiff's speaking time and remove him. Police officers dragged Plaintiff, who lay prone on the floor in protest of Council's vote, from the meeting hall to applause. He sued, alleging violations of his rights under the U.S. and Virginia Constitutions. The City of Charlottesville asks for judgment in its favor, and Plaintiff requests an injunction against the group defamation rule.

Case 3:16-cv-00057-NKM-JCH   Document 28   Filed 11/18/16   Page 1 of 44   Pageid#: 239

The central question in this case is: Can a local government—consistent with the Constitution—open a forum for citizens to address their elected representatives on whatever subject they believe merits attention, yet then ban speech it deems to be a "defamatory attack" on groups? Here, the answer is "no." Because the group defamation rule offends the First and Fourteenth Amendments on its face and as applied to Plaintiff, the Court will enjoin its use.

The City has one central, substantive defense of the group defamation rule: Apply *Steinburg v. Chesterfield County Planning Commission*, 527 F.3d 377 (4th Cir. 2008). That case held (with important caveats discussed later) that a content-neutral rule banning "personal attacks" in a limited public forum (*i.e.*, during a planning commission hearing convened solely to discuss whether to defer an agenda item to the next meeting) was not facially unconstitutional.

The City's reliance on *Steinburg* is misplaced for several reasons. To name a few: (1) the Supreme Court changed the content-neutrality test for rules about speech in 2015, so *Steinburg*'s 2008 analysis is outdated; (2) the forum here was opened so widely that there were practically no subject-matter limitations, casting significant doubt on both the legitimacy of the group defamation rule and the City's *post hoc* interest in curtailing allegedly "irrelevant" speech. These and other points result in the application of strict scrutiny to the group defamation rule, which it cannot survive because the City has neither asserted nor shown a compelling governmental interest. Moreover, the City fails to put forth any colorable argument why the group defamation rule is not void for vagueness.

For these reasons and those that follow, the City's request for dismissal will be denied, and Plaintiff's motion for a preliminary injunction will be granted.

## I.     THE PENDING MOTIONS AND THE RELEVANT LEGAL STANDARDS

The City originally sought to dismiss the complaint. (Dkt. 4). Under the applicable

standard, the Court would disregard the complaint's legal conclusions and construe the facts in Plaintiff's favor to decide whether they stated a viable legal theory. *See generally Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007). Facts outside the complaint would not be consulted unless they were subject to judicial notice.

Plaintiff reciprocated by filing a motion for a preliminary injunction. While briefing these motions, the parties liberally filed and cited to various documents and evidence. Though unproblematic for the preliminary injunction, some of these documents—including affidavits— ordinarily would not be considered on a motion to dismiss without converting it to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). The Court thus intended to employ a motion-to-dismiss analysis (factually limited to the complaint and a judicially-noticeable video of the June 20th meting[1]), then consult the additional evidence when ruling on injunctive relief.

At oral argument, however, the City sought to convert its motion to dismiss to one for summary judgment. The Court asked Plaintiff whether he had any additional evidence (beyond what his attorneys previously entered into the record before they withdrew) to submit. He said he did not. (Hr'g Tr. at 2–3).[2]

Accordingly, the Court will take the City's motion as one for summary judgment. Although the Court must construe the facts in Plaintiff's favor, *see* Fed. R. Civ. P. 56(a);

---

[1] *See* http://charlottesville.granicus.com/MediaPlayer.php?view_id=2&clip_id=1156. Courts take judicial notice of proceedings before legislative bodies and of content available on official governmental websites. *See Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 n.22 (10th Cir. 2009); *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 695 n.3 (S.D.N.Y. 2011). The video would also be taken not as evidence of the truth of any statement contained therein, but rather simply to ascertain the underlying facts of the case. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 & n.6 (4th Cir. 2015); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015); *cf. Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 556–58 (4th Cir. 2013) (reversing notice of City's video because district court used it for an incorrect purpose).

[2] Citations to the transcript are to a provisional rough draft provided by the court reporter.

3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), here the material facts are not in dispute.

## II.    FACTS

### A.    The "Matters by the Public" Comment Period during Council Meetings

At the beginning and end of every Council meeting, the Council holds a "matter by the public" comment period ("public comment period").[3]  (Dkt. 10-1 [hereinafter "Rules"] § D.1). Speakers may speak only once during each public comment period, are limited to three minutes speaking per period, and must directly address the Council.  *Id*., § D.5.  The purpose of the public comment period is for a speaker to "[1] to state a position, [2] provide information to the City Council, [3] comment on the services, policies and affairs of the City, or [4] present a matter that, in the speaker's opinion, deserves the attention of [the] City Council."  *Id*., § D.4.

Nonetheless, the Council's rules specifically prohibit seven topics or categories of speech, including campaign statements and the promotion of "private business ventures."[4] Rules, §§ D.9(a)–(b).  As most relevant here, the Council prohibits "defamatory attacks on individuals or groups."  *Id*., § D.9(g).  It also forbids using "profanity or vulgar language or gestures."  *Id*., § D.9(c).  These prohibitions are not further defined, and Rule D.9(g) is challenged only insofar as it applies to defamatory attacks on groups, not individuals.  Thus, the Court refers to Rule D.9(g) as the "group defamation rule."

The Mayor is the presiding officer at Council meetings and is tasked—according to the Rules—with preserving order and decorum.  Rules § C.1.  Speakers who violate the Council's

---

[3]    This period is distinct from a "public hearing," during which citizens are invited (and limited) to comment on a designated agenda item.  *See* Rules, §§ D.1, D.5 ("When speaking during a public hearing, speakers shall limit their remarks to those relevant to the pending agenda item.").

[4]    These categorical carve-outs from the public comment period are not challenged here.

4

Rules are supposed to be called to order by the Mayor.  If the violation continues, then the Mayor may instruct the speaker to stop talking and sit down.  If that instruction is not followed, then the Mayor can order that the speaker be escorted from the meeting room.  *Id*., § D.10.  The Mayor can also order removal "for a serious violation of these rules, disruptive behavior, or any words or action that incite violence or disorder . . . ."  *Id*., § D.11.

According to the Council's clerk, the Council adopted its rules and procedures in February 2016, a few months before the meeting that spawned this case.  (Dkt. 17 ¶ 2).

**B.      Plaintiff's Views**

Plaintiff is active in civic affairs, having appeared before the Council many times to express his views about important issues in the City.  (Dkt. 9 ¶ 2).  He believes, based on his readings, that "when a critical mass of Muslims are in a community, there are inevitably threats to the safety of that community."  (*Id*. ¶ 3).  He attended the June 20, 2016 Council meeting and signed up to speak about his "concerns about [the City] receiving an unlimited and unvetted [*sic*] number of Muslim refugees into the community."  (*Id*.).

**C.      The City Council Meeting of June 20, 2016**

**1.      Plaintiff's initial comments**

At the June 20th meeting, Mayor Michael Signor introduced the public comment period.  (Video 00:18:08).  He then read the "guidelines for public comment," noting that the Council "welcome[s] public comment" as "an important part of our meeting":

> Please follow these guidelines for public comment.  [1] If you're here to speak for a public hearing, please wait to speak on the matter until the report of that item has been presented and the public hearing has been opened.  [2] Each speaker has 3 minutes to speak, please give your name and address before beginning your remarks.  [3] Please do not interrupt speakers, whether or not you agree with them.  [4] Please refrain from using obscenities.  If you cannot follow these guidelines you will be escorted from City Council Chambers and not permitted to reenter.  [5] And then there's also the other guidelines that are in our procedures

that we have.  Just pay attention to the timing here, yellow when you're getting close to the end of the 3 minutes and red when the 3 minutes are up.

(00:18:08—00:19:15; *see also* dkt. 16-2 at ECF 2 (copy of guidelines).  These guidelines thus incorporate by reference the Rules, including the group defamation rule.

The Mayor then recognized Plaintiff as the first speaker.  Plaintiff explained his view that—although many "people from the Middle East" are "real good people"—some are not, and thus the Council should undertake "some methodology" or "system" to curtail "unrestricted, unrestrained immigration":

> I have come here again today to speak to you all about my deep concerns about the unrestricted, unrestrained immigration of people from the Middle East, many of whom are real good people.  But, unfortunately, some of them are not. And we need to devise some sort of a system to make sure that those people that are doing bad things in Europe do not come here to Pleasantville Charlottesville.
>
> Case in point, I specifically mentioned last time I was here Amarillo, Texas. Remember? You remember?  Amarillo, Texas. A Somali Muslim took the manager of a Wal-Mart and several of his associates hostage; a S.W.A.T. team had to come and kill him.  That's on the news.
>
> Secondly, it turns out that Amarillo, the Yellow Rose of Texas, has the highest reported incidents of rape in the state of Texas. Want to know why? It's very simple, just like it is everywhere else: because they have the largest ratio of Muslim migrants to indigenous peoples living there.  That's why. Just like it is in Dresden, Germany; just like it is in Oslo, Copenhagen; just like it is in Utica, New York; just like it is in Birmingham, Britain; it's always the same thing. When we reach a critical mass of Muslims, then things start to change.
>
> Right now, Pleasantville here hasn't hit that mass. But we're having more and more of those folks coming in here.  I'm not saying they shouldn't come here; I'm saying that there needs to be some methodology for making sure that bad people don't come here. And by the way, [Vice-Mayor] Wes [Bellamy], you and I just talked about this. Why does the IRC not bring any Arab Christians into this community? It's only Arab Muslims. Why is that? I wish someone could tell me.
>
> Secondly, and a far more horrendous story, this just came out. Twin Falls, Idaho. It's on their local news. Five-year-old girl kidnapped and raped by three Syrian Muslim boys ages 13, 9, and 8.  The 13-year-old raped her; he was old enough to do that.  The 9- and 8-year-old, who were not old enough to ejaculate, urinated in her mouth and all over her body.

(00:19:20—00:21:30).  This last comment—the recounting of vivid details of a purported gang rape—drew an interruption from Councilmember Kristin Szakos, who asked if Plaintiff "realized that there are children watching on TV?"   Mayor Signer then interjected that "we try to prevent description of vulgarity."

Councilmember Szakos's question provoked a brief exchange between herself, Plaintiff, and the Mayor that resulted in Plaintiff's time being extended:

Plaintiff:        It's free speech.

Szakos:        I'm asking a question.

Plaintiff:        Pardon me?

Szakos:        Can you just keep in mind that there are children watching on TV.

Plaintiff:        Well, I'm keeping in mind that there are children here in this community that need to be protected from your reckless policies.

Mayor Signer: Let's just let him . . .

Plaintiff:        So please do not lecture me.

Szakos:        I'm not lecturing you.

Plaintiff:        Well, please don't.  You've just taken some of my valuable time and I want it back.

Szakos:        You have it now.

Plaintiff:        You have a habit – in fact, you're not even supposed to be talking.

Signer:         We'll give you your time back.

Plaintiff:        Thank you.  Neither of you are supposed to be talking to me.  Your rules are that you don't speak to us.  That's your rules and you both just broke your rules again.  Don't break your rules.  If I have to follow your rules, you damn well will follow them also.

Now, later, two young Muslim men - you can imagine how traumatized her parents are, and her grandmother – later two young

7

> Muslim men came and threatened the child's mother, warning her
> not to call the police, which they did do. This is a quote from a
> retired Department of Homeland Security Officer, Phillip Haney…

(00:21:35—00:22:30). At that point, Plaintiff's extended time expired, and Mayor Signor reminded him that "we have a free speech—we have a free period at the end of the meeting when you can also speak."

The initial public comment period remained open for additional citizens, who shared their views without incident on issues such as: city parking; concealed gun possession as protection against "radical Islamic terrorists" who are "vicious animal[s]," (00:26:00—00:27:00); *but see id.* 00:33:30—00:35:00 (advocating against concealed carry in private businesses)); toxic mold and water damage in housing; and, pedestrian safety (00:37:00).

### 2. Gun control resolution and the second public comment period

As part of its consent agenda, the Council considered a resolution presented by Councilmember Szakos calling for "statewide and national gun control legislation, and for local control over gun regulation." (01:55:05—01:58:00). The resolution as introduced and read by Szakos was, in part, a reaction to the then-recent mass shooting at the Pulse nightclub in Orlando, Florida. The Council debated the resolution for approximately thirty minutes before voting unanimously in its favor; it then opening the final public comment period governed by "same rules that were read out at the beginning." (02:25:00—02:25:50).

The first three speakers addressed the Council's gun resolution, with the first speaker supporting it and the second two opposing it. (02:25:55—02:30:05). The second speaker decried the supposed "hypocrisy" of the resolution because it sought limitations on guns that citizens might use to protect themselves, but the Council retained armed officers for its protection.

### 3. Plaintiff's second comments and forcible removal

Plaintiff then approached the lectern and began his comments:

> . . . Why in the world would we trust any of you? You hypocrites. You talk, you talk about safety. You want public safety, but none of you, none of you have the courage to mention that the shooter[5] happened to be a Muslim.

> And, in fact, in the Koran, Mohammed, the deviant monster that he was, said, this is a direct quote from Mohammed the Profit of God. He is a profit of god, the question is, which god is what I'm wondering about. He, himself, said, "Kill the sodomites and those who allow themselves to be sodomized." That's a quote, almost verbatim, from the Koran.

> And so the Muslims, monstrous maniacs that they are, read their holy book and then they go out and perpetrate these horrible crimes.

(02:30:09—02:31:00).

The Mayor then interrupted Plaintiff before the conclusion of his time, and the following exchange occurred:

Signer: I'm gonna, I'm gonna interrupt you because we actually prohibit defamatory attacks on . . . groups in our rules. We actually do, and it's duly passed . . .

Plaintiff: But the Constitution guarantees me . . . no, no, no . . . the Constitution guarantees me the right to free speech, and I am allowed to speak my mind, and I will do so.

Signer: We have, we have full authority to . . .

Plaintiff: The Consti. . . no, no, no, your defamatory [*sic*] rules do not overcome the Constitution.

Signer: I'd like to request his removal.

Plaintiff: I have a right to speak my mind.

Signer: Is there a council vote for removal of Mr. Draego?

[*Council votes for removal*]

---

[5] Presumably, Plaintiff was referring to the shooter at the Pulse nightclub in Orlando, as it was that shooting that spurred the Council's resolution.

Case 3:16-cv-00057-NKM-JCH   Document 28   Filed 11/18/16   Page 9 of 44   Pageid#: 247

Plaintiff:         I have a right to speak.

Signer:            Alright.

Plaintiff:         The Constitution guarantees me the right to free speech.

(02:31:01—02:31:27).

At that point, as police officers approached, Plaintiff lay prone on the ground in front of the lectern. Plaintiff stated from the floor that he would "refuse to be quiet. He's [*i.e.*, the shooter] a Muslim who shot those people and he did it because hates, he hates gays. . . . And shame on you all for violating my constitutional rights. [*To the officers*] No sir, you can drag me out of here." The police officers obliged, dragging Plaintiff from the meeting hall by his arms as some citizens in attendance applauded. (02:31:28—02:32:05).

### D.      Aftermath

Plaintiff still wishes "to speak at future council meetings about [his] concerns about immigration of Muslims and other topics"; but he claims he is "reluctant to do so while the council has the power to stifle [his] free speech." (Dkt. 9 ¶ 6).

The Council's clerk relays that "neither the Mayor nor the [Council] has barred [Plaintiff] from attending or speaking during any City Council meetings in the future." (Dkt. 17. ¶ 5). As proof, the clerk produced minutes of the July 5, 2016 meeting, which summarized Plaintiff's statements that "this is the eighth time he has come to express concern about the types of foreigners who are coming to Charlottesville, particularly young Muslim men," and "Charlottesville will see an increase in certain types of crimes as a result." (*Id*. ¶ 6; dkt. 17-1 at ECF 2).[6]

---

[6]      At argument, Plaintiff said he did not attended the July 5, 2016 meeting, and maintained that he had not returned to Council meetings after June 20th. Plaintiff's recollection appears incorrect, as the July 5th video shows he appeared and spoke at the meeting. *See* http://charlottesville.granicus.com/MediaPlayer.php?view_id=2&clip_id=1161 (26:30–28:30).

Finally, the clerk states that Plaintiff "is still allowed to speak during the City Council's regular meetings *as long as* he complies with the" Council's rules. (Dkt. 17 ¶ 7 (emphasis added)). But the enforceability of the group defamation rule is the issue in this case.

## III. THE CITY'S "IMPROPER DEFENDANT" ARGUMENT

The City makes a threshold procedural argument that Plaintiff "sued the wrong party" because it is not a proper defendant. (Dkt. 5 at 3). The City cites *Miller v. Highland Cty.*, 274 Va. 355, 650 S.E.2d 532 (Va. 2007), as well as Virginia Code §§ 15.2-1401, 1415, 1425, and 1427, for the proposition that a locality and its governing body are distinct legal entities under Virginia law.

Plaintiff asserts that *Miller* is unavailing, as it dealt only with which entity is a required party under state law when a citizen appeals a zoning decision. (Dkt. 11 at 2-3). In this federal civil rights case, he contends, federal law governs the question and permits liability under 42 U.S.C. § 1983 for a municipality's unconstitutional action.

"No one has ever doubted . . . that a *municipality* may be liable under § 1983 for a single decision by its *properly constituted legislative body* . . . because even a single decision by such a body unquestionably constitutes an act of official government policy." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (emphasis added) (citing § 1983 against cities for unconstitutional actions by city councils). "[W]here action is directed by those *who establish governmental policy*, the *municipality* is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id*. at 481 (emphasis added); *see also id*. (municipal liability attaches when decisionmaker possesses final authority to establish municipal policy regarding the action). The Charlottesville City Council—composed of the Mayor, Vice-Mayor, and other councilmembers—is the "properly constituted legislative body" whose actions

11

"establish[es] government policy" for the City within the meaning of *Pembaur*. *See* Va. Code §§ 15.2-1401 (locality's powers are vested in governing body), -1425 (locality's governing body acts by adopting "ordinances, resolutions and motions"). Thus, the City is a proper defendant for purposes of Plaintiff's federal constitutional claims because unconstitutional actions of its Council are attributable to it.[7]

Plaintiff also asserts a supplemental state law claim for violation of his rights guaranteed by the Virginia Constitution. The parties' briefs do not account for the possibility that the state law nature of the supplemental claim may affect the proper party analysis. For instance, under *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938), the Court is obliged to apply state law to substantive issues and federal law on matters of procedure. The Court will not embark on a *sua sponte* inquiry into whether—for purposes of analyzing if a defendant is a proper party to a supplemental claim—federal procedural law (such as Rules 17, 19, or 20) or state substantive law governs. For now, it is sufficient to observe that the parties have not raised the issue as it relates to the supplemental claim, nor have they briefed matters such as *Erie* that would be

---

[7]    The City's contention (dkt. 14 at 7) that it is not vicariously liable for actions of the Council misunderstands the dynamic between *respondeat superior* and municipal liability in constitutional tort litigation.

The Supreme Court has repeatedly emphasized that a municipality cannot be liable simply because a low-level employee acts unconstitutionally. *See Pembaur*, 475 U.S. at 478-79 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). That would be *respondeat superior* liability, and the avoidance of that result is why there must be an illegal official policy or custom for municipal liability to attach. But "proof that a municipality's legislative body . . . has intentionally deprived a plaintiff of a federally protected right necessarily establishes" just such a policy. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 405 (1997).

In urging it cannot be liable except for "deliberate indifference" to Plaintiff's constitutional rights, the City apparently conceptualizes its relationship with the Council for § 1983 purposes as if the Council were a beat cop who negligently conducted an unconstitutional search. That type of violation would "simply . . . show that the *employee* acted culpably," which is why such a fact-pattern requires proof of "deliberate indifference" before the City could be held liable. *Id.* at 406-07 (emphasis in original). But that test does not apply when considering the constitutionality of decisions made *by the Council*. Instead, it is "obvious" that a "decision[] duly promulgated by city lawmakers" results in "municipal liability if the decision itself" is unconstitutional. *Id.* at 406.

necessary to its resolution.  Thus, the topic is reserved for decision upon appropriate submissions by the parties at a later time.

## IV.    GROUP DEFAMATION

Turning to the First Amendment claim, the initial "inquiry" must assess whether Plaintiff engaged in speech covered by the Constitution.  *ACLU v. Mote*, 423 F.3d 438, 442 (4th Cir. 2005); *Goulart v. Meadows*, 345 F.3d 239, 246 (4th Cir. 2003).   Plaintiff's statement—"the Muslims, monstrous maniacs that they are, read their holy book and then they go out and perpetrate these horrible crimes"—led to his removal from the June 20th meeting.  The Council believed this statement was group defamation, and the group defamation rule is what Plaintiff seeks to have declared unconstitutional.  (Dkt. 3, Prayers for Relief (a)-(b)).  Thus, the Court explores the legal concept of group defamation under the Constitution and Virginia law.

### A.    Group Defamation Is Not Categorically Exempt from the First Amendment.

The seminal group defamation/libel case is *Beauharnais v. Illinois*, where the Supreme Court held that the First Amendment did not negate a statute banning negative and critical portrayals of a "class of citizens of any race, color, creed or religion."  343 U.S. 250, 251 (1952).  *Beauharnais* has not been explicitly overruled, but "its continued vitality has been questioned." *Sambo's Restaurants, Inc. v. City of Ann Arbor*, 663 F.2d 686, 694 n.7 (6th Cir. 1981).

For one, *Beauharnais* predated free speech decisions—such as *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974)—that tightened constitutional limits on defamation law.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992) ("Our decisions since the 1960's have narrowed the scope of the traditional categorical exception[] [from the First Amendment] for defamation . . ."); *see id*. at 427–28 (Stevens, J., concurring); *Herbert v. Lando*, 441 U.S. 153, 158–59 (1979) (citing *Beauharnais*

and noting subsequent "major changes" to constitutional law based on *Sullivan* and other cases).

Second, later Supreme Court cases have specifically lent constitutional protection to odious speech about groups. *See*, *e.g.*, *R.A.V.*, 505 U.S. at 391 (holding ordinance banning symbols arousing "anger, alarm or resentment in others" based on "race, color, creed, religion, or gender" is "facially unconstitutional"); *Brandenburg v. Ohio*, 395 U.S. 444, 446 & n.1 (1969) (overturning conviction stemming from assembly and speeches at KKK rally attacking African-Americans and Jewish people); *Snyder v. Phelps*, 562 U.S. 443, 454–56 (2011) (finding anti-gay, anti-soldier, anti-Catholic protests near military funeral protected).

The Fourth Circuit has recognized that *Sullivan* and its progeny indeed marked a break with pre-1964 defamation jurisprudence like *Beauharnais*. *See Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1551–52 (4th Cir. 1994). For years, other circuits also have questioned the case. Shortly after *Sullivan*, one judge observed that "far from spawning progeny, *Beauharnais* has been left more and more barren by subsequent First Amendment decisions, to the point where it is now doubtful that the decision still represents the views of the Court." *Anti-Defamation League v. F.C.C.*, 403 F.2d 169, 174 n.5 (D.C. Cir. 1968) (Wright, J., concurring). It "has been subjected to great criticism" and "little remains of [its] doctrinal structure." *Tollett v. United States*, 485 F.2d 1087, 1094 & n.14 (8th Cir. 1973). The Seventh Circuit agreed when striking down a ban on promoting or inciting "hatred against persons by reason of their race, national origin, or religion"; it expressed grave doubts that *Beauharnais* "remains good law at all . . . ." *Collin v. Smith*, 578 F.2d 1197, 1199, 1204–05 (7th Cir. 1978).

Recent cases have not been kinder. The Seventh Circuit also opined that "no one thinks the First Amendment would today be interpreted to allow group defamation to be prohibited." *Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 672 (7th Cir. 2008). The

14

Ninth Circuit concurs. *See Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1200 (9th Cir. 1989) (*Beauharnais* "substantially undercut" and "weakened by subsequent cases" that eroded its foundations; "group libel claims [are] highly questionable at best") (citing *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 331 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986)).

In sum, *Beauharnais* does not apply to this case.[8] Unlike the handful of narrow carveouts to the right of free speech (*e.g.*, fighting words, incitement to imminent violence, obscenity), "group defamation" or "group libel" are not categorically exempt from coverage under the First Amendment. As a result, a blanket rule prohibiting group defamation cannot be valid of its own force, but rather must be justified by reference to other doctrinal principles.

## B. Group Defamation Is Virtually Nonexistent in Virginia and Does Not Apply to Plaintiff's Speech.

To the extent group defamation remains unprotected by the First Amendment from state regulation, Virginia law still would not ban the speech here: The concept is so circumscribed in Virginia that it is nearly moribund and inapplicable to Plaintiff.[9]

The Virginia Supreme Court recognized long ago that "[i]f the class or group involved is a very large one, and there is little or nothing which applies to the particular person who brings the action, his right of recovery will generally be denied." *Ewell v. Boutwell*, 121 S.E. 912, 914 (Va. 1924).

---

[8] Academic commentary is in substantial agreement that *Beauharnais* is no longer good law. *See* Eugene Volokh, *One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking"*, 107 Nw. U. L. Rev. 731, 781–82 (2013); Note, *Free Speech, Hate Speech, and the Hostile Speech Environment*, 98 Va. L. Rev. 1577, 1584 & n.42 (2012); Nadine Strossen, *Regulating Racist Speech on Campus: A Modest Proposal?*, 1990 Duke L.J. 484, 518 (1990).

[9] "Defamation" is a technical legal term with specific contours. If the Council uses that term not in a legal sense—but in a subjective, idiosyncratic, or colloquial way (*see* dkt. 20-1 at 2, 12; Hr'g Tr. at 34)—then the rule presents concerns about vagueness, overbreadth, excessive discretion, and arbitrary enforcement that are addressed later in this opinion.

> [A] charge of cowardice against a whole army, without specifying individuals, will not entitle a single soldier to maintain an action therefor[e], and that an attack upon wine sellers is insufficient to enable a single wine seller to recover damages . . .

*Id.*; *see id.* at 916 (defamatory words "must refer to some ascertained or ascertainable person"); *Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d 130, 147 (D.D.C. 2005) (applying Virginia law). *Ewell* theoretically permitted a claim for defamatory statements "directed towards a comparatively small or restricted group of persons." *Id.* at 914. Hence, Virginia limits group libel claims to this "'small group theory' exception." *Dean v. Dearing*, 561 S.E.2d 686, 688 (Va. 2002); *see also Gazette, Inc. v. Harris*, 325 S.E.2d 713, 738 (Va. 1985). This limitation is but an iteration of general defamation principles: If the defamed individual(s) cannot be personally ascertained, then no cause of action exists.

Plaintiff's sweeping statement that "the Muslims" (of which there are millions nationally and over a billion worldwide) are "monstrous maniacs" who "perpetrate these horrible crimes" is so broad that it would not fall within the ambit of Virginia's small group theory exception.[10] So even if *Beauharnais* remains valid and removes any constitutional impediment to banning group defamation, that concept in Virginia does not reach Plaintiff's speech.

This point and *Beauharnais*'s lack of vitality mean that the rule cannot stand on the grounds that "group defamation" is a special, disfavored category of speech receiving no First Amendment solicitude. Rather, the rule must be justified under other free speech precepts.

## V.     BASIC FIRST AMENDMENT PRINCIPLES

General legal principles about free speech suggest that a defense of the group defamation

---

[10]     Moreover, given its breadth and apparent rhetorical usage, Plaintiff's comment is best understood not as a statement of fact, but as non-actionable opinion, hyperbole, and/or offensive words. *See Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005); *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 137 (Va. 1998) ("rhetorical hyperbole" not defamatory); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) ("Merely offensive or unpleasant statements are not defamatory").

16

rule faces an uphill battle.  The First Amendment offers heightened protection to speech about government policy and matters of public concern, and it disfavors restrictions imposed based on speech's offensiveness, content, or viewpoint.  These rules, however, are not ironclad; they are sometimes circumscribed depending on the context in which the speech takes place.

### A.      Speech on Politics, Policy, and Public Matters Receives Special Protection.

It is a "fixed star in our constitutional constellation . . . that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ."  *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Speech on matters of public concern, especially made in a setting generally open to speakers, "is entitled to special protection under the First Amendment," *Snyder v. Phelps*, 562 U.S. 443, 458 (2011), because our country has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ."  *Sullivan*, 376 U.S. at 270.  "[E]xpression on public issues has always rested on the highest rung of the hierarchy of First Amendment values," as "it is the essence of self-government."  *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982).  As a result, free speech doctrine in many contexts has developed to permit speech touching upon political topics, matters of governance, and other issues concerning the public— even (perhaps especially) when the views espoused by the speaker were unpopular.[11]

---

[11]      *See*, *e.g.*, *Snyder*, 562 U.S. at 448–49 (signs conveying views that 9/11 terrorist attacks were warranted and U.S. soldiers are killed to atone for U.S. misdeeds); *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (burning American flag that was culmination "of a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President"); *Cohen v. California*, 403 U.S. 15, 18 (1971) (citizen wearing "Fuck the Draft" jacket in court); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969) (schoolchildren's symbolic speech "exhibit[ing] their disapproval" of Vietnam War); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 574–75 (1968) (public employee's right to speak on "matters of public concern" and "issues of public importance" without retaliation); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (subjecting "laws that burden political speech" to "strict scrutiny").

### B. Offensiveness Is Not a Basis To Restrict Speech.

Another "bedrock principle" of free speech is "that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder*, 562 U.S. at 458. Even "deeply offensive" speech like "virulent ethnic and religious epithets, vulgar repudiations of the draft, and scurrilous caricatures" is typically protected. *United States v. Eichman*, 496 U.S. 310, 318–19 (1990) (summarizing cases) (internal citations omitted); *see Cohen v. California*, 403 U.S. 15, 18 (1971) (overturning conviction "quite clearly rests upon the asserted offensiveness of the words" for wearing "Fuck the Draft" jacket in court).

This is because a chief "function of free speech under our system of government is to invite dispute," which commonly "induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Texas v. Johnson*, 491 U.S. 397, 408–09, (1989). That speech has "racist and sexist overtones," involves overbroad "caricature[s]" of certain citizens, or is "sophomoric and offensive" provides no justification for its suppression. *IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386, 387–88 (4th Cir. 1993) (protecting faux "ugly woman contest" containing caricatures of minorities).

### C. Viewpoint and Content Discrimination Are Deeply Suspect.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). A governmental entity "is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 579 (1995). "Discrimination against speech because of its message is *presumed* to be unconstitutional." *Rosenberger*, 515 U.S. at 828 (emphasis added); *see*

*Rossignol v. Voorhaar*, 316 F.3d 516, 521 (4th Cir. 2003).

Viewpoint discrimination is "an egregious form of content discrimination in which the government targets not subject matter, but particular views taken by speakers on a subject. Content discrimination includes both viewpoint-discriminatory rules and rules that limit forums to particular subjects, irrespective of viewpoint." *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1067 n.2 (4th Cir. 2006) (hereinafter "*CEF*") (internal citations and quotations omitted).[12]

 "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015). "Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a 'more blatant' and 'egregious form of content discrimination.'" *Reed*, 135 S. Ct. at 2230 (quoting *Rosenberger*, 515 U.S. at 829).

If a restriction on speech is viewpoint or content based, then it must survive strict scrutiny. *See Reed v*, 135 S. Ct. at 2226, 2232; *Baugh v. Judicial Inquiry & Review Comm'n (JIRC)*, 907 F.2d 440, 444 (4th Cir. 1990). This means the measure must serve a compelling governmental interest and be narrowly drawn to achieve it. *Reed*, 135 S. Ct. at 2226.

A content-neutral regulation, on the other hand, must satisfy only intermediate scrutiny— *i.e.*, be narrowly tailored to further a substantial government interest and leave ample channels of communication available. *See Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 365, 369

---

[12] A "corollary of the prohibition on viewpoint discrimination is the principle that administrators may not possess unfettered discretion to burden or ban speech, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or view-point of the speaker." *CEF*, 470 F.3d at 1068 (internal quotations omitted).

(4th Cir. 2012). The "crucial first step in the content-neutrality analysis" is "determining whether the law is content neutral on its face." *Reed*, 135 S. Ct. at 2228. If it is not facially neutral, then it "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus towards the ideas contains." *Id.*. If the restriction is content-neutral on its face, then the purpose and justification for the law are analyzed to ensure that they too are not content-based. *Id.*; *see Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 632 (4th Cir. 2016); *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015).

### D. The Forum Where Speech Occurs Bears On Its Permissibility.

Despite the foregoing guideposts, even speech covered by the First Amendment "is not equally permissible in all places and at all times." *Snyder*, 562 U.S. at 456. "There are three different types of forums in First Amendment cases, traditional public forums, non-public forums, and limited (or designated) public forums." *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005); *see CEF*, 470 F.3d at 1067–68. "The ban on viewpoint discrimination is a constant. Beyond this, speakers' rights depend upon how widely the government has opened its property and its purposes in doing so." *CEF*, 470 F.3d at 1067.

"The first category [is] the traditional public forum, [] a place that by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003). Content-based restrictions there must survive strict scrutiny, and content-neutral "time, place, and manner" regulations of speech are subject to intermediate scrutiny. *Id*.

Second, a "nonpublic forum" is "not open by tradition or designation to the public for expressive activity. The government can restrict access to a nonpublic forum as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Id*. (internal quotations omitted). "Control over access to a

nonpublic forum can be based on subject matter and speaker identity as long so the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 248–49.

Third, a "designated' or "limited" public forum occurs when "the government has opened [property] for expressive activity to the public, or some segment of the public." *Id.* at 249; *see Mote*, 423 F.3d at 443. This forum "can only be created by purposeful government action in which the government must intend to make the property generally available. If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny." *Goulart*, 345 F.3d at 249

## VI.    THE CITY'S CORE ARGUMENT: *STEINBURG*

With these legal principles in tow, recall the facts. The Council invites citizens during the public comment period to share their views on whatever topic the speaker feels warrants the Council's attention. Plaintiff—like other citizens who spoke on a range of issues—accepted that invitation, opining on a matter of public and political concern (namely, public safety and immigration). He first shared his belief that the City's inaction and refusal to curtail local immigration of Muslims has endangered the Charlottesville community. Then, after the Council adopted a gun control resolution, he dovetailed the Council's vote with his prior position to illustrate his point: Plaintiff contended that the shooter at the Orlando nightclub (*i.e.*, the incident which spurred the resolution) was, in fact, a Muslim. Muslims, Plaintiff said, are "monstrous maniacs" who commit "horrible crimes." The Council then voted to halt Plaintiff's speech due to its rule against group defamation.

To defend this action, the City's major argument relies on a Fourth Circuit case about rules of decorum, disruption, and proper topics at a planning commission meeting.

## A.  *Steinburg v. Chesterfield Cty. Planning Comm'n* (4th Cir. 2008)

In *Steinburg*, the Fourth Circuit upheld against a free speech challenge the decision of a planning commission chairman to remove a speaker from a public meeting of the commission. 527 F.3d 377, 379 (4th Cir. 2008).  At this high level of abstraction, *Steinburg* appears to support the City.  But that seeming similarity is superficial, as a careful review shows.

Most centrally, the purpose of the meeting (and matter on which citizens were invited to speak) in *Steinburg* was narrowly circumscribed.  Originally, the commission was to hear an application for a zoning variance. *Steinburg*, 527 F.3d at 380.  But just before the meeting, the applicant asked to defer the matter to a later meeting.  As a result, citizens were invited "to speak only on the limited issue of whether to grant [the] request to defer consideration of its application . . . ." *Id*.  The chairman made this limitation clear to speakers who approached the podium, and he occasionally reiterated the point when the speakers (who spoke respectfully) strayed off topic to the merits of the application.  *Id*. at 380–81.

Mr. Steinburg then spoke, but "unlike the previous two speakers, he made no effort to relate his comments to either the [] deferral request or the [merits of the variance]." *Steinburg*, 527 F.3d at 381.  He began with a rambling statement and verbally attacked a commissioner, which provoked an argument about his abuse of the podium.  *Id*. at 381–82.  The chairman attempted to refocus the issue to elicit his views on the deferral, but the situation devolved into a shouting match, so the chairman called for and obtained Steinburg's removal.  *Id*. at 382–83, 389–90.  He filed suit, arguing that the commission's policy against "personal attacks" was unconstitutional and that he was discriminated against on the basis of viewpoint.  *Id*. at 384.

The Fourth Circuit concluded, as had the parties, that the commission's meeting was a limited public forum.  *Steinburg*, 527 F.3d at 384–85.  It articulated three principles regarding

22

"government's ability to restrict speech in a limited public forum":  (1) speakers at public meetings have First Amendment protections against general restrictions or *ad hoc* parliamentary rulings by presiding officials; (2) to protect the hearing's orderliness and fairness, officials may set the subject-matter agenda, make reasonable time-place-manner restrictions, and cut off speech which imminently threatens or is perceived to imminently threaten to disrupt the meeting based on its irrelevance, duration, tone, or manner of delivery, and; (3) official discretion is not limitless and cannot be based on viewpoint discrimination.  *Id*. at 385–86.

The Fourth Circuit first analyzed the commission's rule against "personal attacks."  As for a facial challenge, "a personal attack is surely irrelevant [and thus subject to limitation]— *unless*, of course, the topic legitimately at issue is the person being attacked, such as his qualifications for an office or his conduct."  *Steinburg*, 527 F.3d at 387 (emphasis added).  The *ad hominem* nature of such attacks often provokes counterattacks that disrupt the meeting.  *Id*. Thus, a "*content-neutral* policy against personal attacks is not facially unconstitutional insofar as it is adopted *and employed* to serve the legitimate public interest in a limited forum of decorum and order."  *Id*. at 387 (emphasis added).

Concerning an as-applied challenge, it did "not appear from the videotape or the transcript of the hearing . . . that the policy against personal attacks was invoked or applied . . . ."  *Id*. at 387.  "At no time during the meeting did [the chairman] cite the 'personal attacks' policy, nor did he ever express a view that he considered Steinburg's comments during the meeting to constitute a 'personal attack.'"  *Id*. at 388.  Thus, the policy was simply not implicated.

Finally, regarding alleged viewpoint discrimination, the Fourth Circuit ruled the chairman cut off the plaintiff solely for his inability to "stay on subject," his continued "discuss[ion of] irrelevant topics," and his "argumentative" statements.  *Steinburg*, 527 F.3d at 389–90.

**B.** *Steinburg* **Does Not Support the Group Defamation Rule in This Case.**

Key facts in *Steinburg* differ from the facts here. These differences significantly affect the legal analysis. Contrary to the narrow deferral issue in *Steinburg*, here the Council essentially created a three-minute-per-speaker "open mic" period. Relatedly, unlike Mr. Steinburg's tangential statements in a circumscribed forum, Plaintiff's comments touched upon the (virtually unlimited) matters on which the Council invited comment.

### 1. This forum was opened widely and Plaintiff's speech fell within it.

What type of forum exists, and thus speakers' rights in the forum, turns on "how widely" the government opens the forum, as well its reasons for doing so. *CEF*, 470 F.3d at 1067. Of course, "the public forum concept does not require that city council meetings always be open." *Hickory Fire Fighters Ass'n v. City of Hickory, N. C.*, 656 F.2d 917, 922 (4th Cir. 1981). What the Council "cannot do, however, is open a meeting to the public and then prohibit . . . speech simply because of [who the speaker] is or what [the speaker] wish[es] to say." *Id.*

Here, the facts show that the Council created a gaping forum.[13] The June 20th video confirms the forum's breadth, with speakers during the public comment period permitted to address issues as diverse as gun possession, parking, toxic mold, and pedestrian traffic. (*E.g.*, 00:26:00—00:27:00; 00:33:30—00:35:00; 00:37:00). And as for forum's purposes, it was opened expressly to permit citizens to "state a position," or "provide information" to the Council, or "comment on . . . policies and affairs of the City," or "present a matter that, in the speaker's opinion, deserves" the Council's attention. Rule § D.4. Plaintiff's speech easily falls within each of these purposes.

There is a respectable argument that the Council created a traditional public forum during

---

[13]    It is important to identify the "forum" involved in this case: the public comment period permitted by the Council, not other portions the Council's meeting (which are either nonpublic fora or very limited public fora on account of the Council's set agenda).

the public comment period.  True, traditional public fora are prototypically associated with public parks and sidewalks, areas with "a tradition and history of being used for expressive conduct."  *ACLU v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005).  But a traditional public forum can also be created "by government fiat."[14]  At least for the public comment period (*i.e.*, the portion of the meeting relevant to this case), the Council's open invitation to all speakers on all topics may very well be such a decree.  Moreover, "[t]he Supreme Court has also identified the 'meeting hall' as a traditional public forum," and that is what the Council arguably created here. *Goulart*, 345 F.3d at 248 n.8 (*quoting Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974)); *see Steinburg*, 527 F.3d at 384.  Strict scrutiny would therefore apply.  *See Goulart*, 345 F.3d at 248.

But the Court need not conclude that the public comment period is a traditional public forum for strict scrutiny to apply.  Even if it is only a limited public forum, the broad contours of that forum, as well as the group defamation rule's lack of content-neutrality, still require the application of strict scrutiny.  Thus, the Court will assume that this case involves a limited public forum, although one nowhere near as narrow as that in *Steinburg*.

### 2. An internal standard, and thus strict scrutiny, applies.

"After determining that a limited public forum exists, a court must next determine whether an internal or external standard should apply."  *Mote*, 423 F.3d at 444; *see Goulart*, 345 F.3d at 250.  Which standard applies then dictates what level of scrutiny the Court uses to assess a restriction on speech.

An "internal standard" applies when:

the government excludes a speaker who falls within the class to which a

---

[14]   *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983); *Sons of Confederate Veterans, Virginia Div. v. City of Lexington, Va.*, 722 F.3d 224, 229 (4th Cir. 2013); *CEF*, 470 F.3d at 1067; *Goulart v. Meadows*, 345 F.3d 239, 248 (4th Cir. 2003).

designated [*i.e.*, limited] public forum is made generally available. In this situation, the government's action is subject to strict scrutiny. In other words, as regards the class for which the forum has been designated, a limited public forum is treated as a traditional public forum.

*Goulart*, 345 F.3d at 250 (internal citations and quotation omitted). On the other hand, an "external standard applies if the person excluded is not a member of the group that the forum was made generally available to." *Mote*, 423 F.3d at 444.

There is no doubt that Plaintiff falls within the class of people to whom the public comment period was open: Citizens who wish to address their elected representatives on a matter that is important to them.[15] Strict scrutiny therefore applies. It is also fatal to the group defamation rule: The City's briefs defend it only on the basis of a *legitimate* (not compelling) public interest in the forum's decorum and order. (Dkt. 4 (Mov. Br.) at 4–6; dkt. 14 (Reply Br.) at 6). With no compelling interest urged to support the rule, it is facially unconstitutional. *See Hickory Fire Fighters Ass'n*, 656 F.2d at 920–21 (holding that where "City Council opens the floor to the public" but fails "to advance a compelling governmental justification for limiting speech . . . at city council meetings, the city council must, whenever it conducts its meetings as open forums, allow [speakers] an opportunity to air" their views).

### 3. The rule is not viewpoint or content neutral, either facially or as applied.

Facial Failings. The ban on defamatory attacks on groups is also facially flawed because it is neither content nor viewpoint neutral. *Steinburg*'s holding was premised on the existence of a "content-neutral policy," which it defined as a policy that "serves purposes unrelated to the

---

[15]     It is true that "in a limited public forum . . . , the government may be justified in reserving [its forum] for certain groups or for the discussion of certain topics." *Goulart*, 345 F.3d at 253 (internal quotations omitted). But that is not what occurred here: The Council opens its public comment period to all citizens to speak on whatever topics concern them. *See City of Madison, Joint Sch. Dist. No. 8 v. Wisc. Employment Relations Comm'n*, 429 U.S. 167, 174–75 (1976). As the City admitted at argument, there are no relevancy restrictions imposed during the public comment period. (Hr'g Tr. at 14).

content of expression . . . ." 527 F.3d at 387. But that rule of law predates (and was overruled by) the Supreme Court's recent decision *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015), which refined the test for content neutrality. The Fourth Circuit has repeatedly held that *Reed* abrogated this Circuit's test by relegating the "purposes" inquiry to a later analytical step. *E.g.*, *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 632 (4th Cir. 2016); *Cahaly v. Larosa*, 796 F.3d 399, 404–05 (4th Cir. 2015) (observing *Reed* "conflicts with" and "abrogates" our "previous descriptions of content neutrality").

Specifically, *Reed* "explained that 'the crucial first step in the content-neutrality analysis' is to 'determin[e] whether the law is content neutral on its face.'" *Cahaly*, 796 F.3d at 405 (quoting *Reed*, 135 S. Ct. at 2228). Thus, courts must now "begin [the] analysis by considering whether the [regulation] 'applie[d] to particular speech because of the topic discussed or the idea or message expressed.'" *Cent. Radio Co.*, 811 F.3d at 633 (quoting *Reed*, 135 S. Ct. at 2227). Only if this step is satisfied do courts examine whether the regulation's justifications are unrelated to content. *Id*. at 632.

Under this revised test, the rule is not content-neutral. The prohibition against defamatory attacks on groups either "applie[s] or d[oes] not apply as a result of content, that is, 'the topic discussed or the idea or message expressed.'" *Cent. Radio Co.*, 811 F.3d at 633 (quoting *Reed*, 135 S. Ct. at 2227). To know whether the rule applies, a speaker and the Council must assess whether speech has an "attack[ing]" character. Additionally, assuming the Council is not using an idiosyncratic meaning of defamation, *but see supra* footnote 9, it must determine if the speech is "defamatory"—*i.e.*, makes the group "appear odious, infamous, or ridiculous," or subjects it to "contempt, scorn, shame, or disgrace." *Schaecher v. Bouffault*, 290 Va. 83, 95, 772 S.E.2d 589, 596 (Va. 2015); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993).

The flipside of this evaluation is statements that (to use some common antonyms) portray the group as "likeable, respectable, or sensible," or subjects it to "adoration, praise, esteem, and adulation" are permissible.

Such inquiries underscore the threat and existence of viewpoint discrimination. *See R.A.V.*, 505 U.S. at 387, 391 (content discrimination "raises the specter" of viewpoint discrimination; holding that "practical operation" of ordinance goes beyond content discrimination "to actual viewpoint discrimination"). As Plaintiff explains:

> [Under the rule, a] citizen may urge the council to encourage and accept more Muslim refugees precisely because they are a peaceful, non-violent peoples. However, Mr. Draego cannot speak in opposition to that proposal and give as his reasons the assertion that Muslims are not peaceful, non-violent peoples.

(Dkt. 11 at 14; *see also id.* at 11–12 (listing other examples)). So if Sally Speaker's position on Issue X is grounded in negative views of some relevant group—*e.g.*, Republicans, liberals, Muslims, citizens who support or benefit from Issue X—those views (and thus the force and logic of her stance) are censored, while people on the other side of Issue X due to inverse, positive perspectives about the relevant group may speak freely. Indeed, the rule fosters discrimination among speakers *on the same side* of Issue X: Sally is barred from justifying her position, but someone with an identical, ultimate position on Issue X may opine at length about the non-group-related reasons for his stance.[16]

The rule's lack of content and viewpoint neutrality is another reason strict scrutiny applies. As stated above, the rule cannot withstand that test because the City has not advanced any compelling governmental interest for it, much less one that is narrowly tailored.

<u>Factual Problems</u>. Setting aside the facial shortcomings with the group defamation rule,

---

[16] Consider an ordinance mandating the number of doors in an abortion facility. A citizen could state her opposition to the ordinance on grounds that it creates an undue burden, or that it is too expensive to enforce. But she could not oppose it because its proponents are conspiring to put local abortion clinics out of business or waging a war on women.

there are factual markers of viewpoint discrimination.  Most strikingly, the City admitted at oral argument that it was the Council's "intent" and "purpose" to keep Plaintiff from saying "monstrous maniacs" again, and that he would be prevented from using that term at future public comment periods.  (Hr'g Tr. at 18).  But the First Amendment does not "indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." *Cohen*, 403 U.S. at 26.

Additionally, "[o]nce [the government] has opened a limited forum, [it] must respect the lawful boundaries it has itself set." *Rosenberger* 515 U.S. at 829; *see Child Evangelism Fellowship*, 470 F.3d at 1067.  The Council's inconsistent application of its rules during the public comment period show that Plaintiff was silenced based on disagreement with his message.

One rule of the public comment period was that others not interrupt speakers, "whether or not you agree with them."  (Video 00:18:08–00:19:15).  When, at the first public comment period, Plaintiff began reading a brutal news story to make his point about the dangers Muslim immigrants pose, Councilmember Szakos interrupted him to ask whether he realized children were listening.  (*Id*. 00:21:00–00:22:10).  The Mayor, in mediating this brief detour, took action to remedy a violation of the anti-interruption rule.  He urged Councilmember Szakos to let Plaintiff finish and granted his request for additional time to account for the time lost due to the interruption.  (00:21:35—00:22:30).  It is reasonable to infer from the Mayor's ruling that he determined Szakos violated the anti-interruption rule.

One might think—as the Mayor alluded to when he expressed disfavor of "descriptions of vulgarity"—that Szakos's interruption was justified to enforce a Council rule against profanity

and obscenity. But if Plaintiff's comment violated some other rule, then the Mayor—as the presiding official—was charged with notifying Plaintiff he was out of order, not another councilmember. *See* Rules §§ C, D(10) (Mayor is presiding official responsible for ruling speakers out of order); Rule § D(3) (councilmembers "shall not respond to public comments as a whole" and may only respond to individual comments with leave from the Mayor to do so).

Lastly, the inconsistent application of the group defamation rule itself is problematic. At the first public comment period, one Mr. Haden spoke against "radical Islamic terrorists" who are "killers." (Video 00:26:00—00:27:00). He then broadened his statement beyond terrorists, mentioning "radical Islamic zealots who only want to kill us" and are "vicious animals intent on killing" (*id.*), a position not materially different from Plaintiff's view that Muslims are "monstrous maniacs" who commit "horrible crimes." Nevertheless, Mr. Haden's comments, unlike Plaintiff's, were allowed without interruption.

The above facts provide proof that the Council did not adhere to the bounds it set for itself during the public comment period, and the nature of that non-adherence indicates it removed Plaintiff because of hostility to his views.

### 4. The facts belie the City's other arguments derived from *Steinburg*.

*Steinburg* does not dictate the outcome here because of legal differences (*e.g.*, *Reed* changed the content-neutrality inquiry) and factual ones (*e.g.*, how expansively the forum was opened; evidence of viewpoint discrimination). But even if one woodenly applied *Steinburg* and intermediate scrutiny, the effort fails. The City asserts that Plaintiff was removed from the meeting for reasons that cannot be squared with a fair view of the facts.

<u>Disruptive or vulgar speech</u>. The City contends that Plaintiff was silenced because of the rule against vulgarity, or because his speech was actually (or reasonably perceived to be)

disruptive. For instance, the City implies Plaintiff's removal was precipitated by his allegedly "verbally abusive and disruptive behavior," and it states without elaboration that Plaintiff "fully intended" to disrupt the meeting and "create chaos and controversy." (Dkt. 5 at 8, 9).

There is no evidence Plaintiff intended to disrupt the meeting. Certainly, Plaintiff feels strongly about Muslim immigration. During the first public comment period, he used harsh words and referenced a gruesome news story to highlight the intensity of his views and the dangers at hand. No doubt many (perhaps most) disagree with his views. But the reaction of listeners is neither a basis to silence the speaker nor reason—except in "rare" and obviously-criminal circumstances—to infer that he wished to incite a disturbance in the chamber. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 248–49 (4th Cir. 1997); *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992). Moreover, Plaintiff was allowed to keep speaking during the first public comment period, and was in fact told he could speak again at the second period.

The City contends that "Plaintiff was not silenced [at the second period] for holding [his] opinions [about Muslims,] but for the vile, vulgar and disruptive means by which he chose to disrupting [*sic*] this meeting in an attempt to prove his point." (Dkt. 5 at 9–10). This contention strains credulity. The video clearly shows the statement that Muslims are "monstrous maniacs" who commit crimes was what spurred the Mayor to censure Plaintiff and call for his removal. And in doing so, the Mayor *expressly cited the group defamation rule*, not other grounds. It is the government's *actual basis* for removal that matters, not after-the-fact justifications. *See Steinburg*, 527 F.3d at 387 (holding as-applied challenge to personal attack policy failed because commission did not rely on that policy), 388 (presiding official did not cite personal attack policy

when silencing speaker); dkt. 20-1 (Amicus Br.) at 9–10. The City's own reply brief recognizes, after arguing to the contrary in its moving brief, that the Mayor cut off Plaintiff because of the group defamation rule. (Dkt. 14 at 6).[17]

Equally clear, the video reveals that Plaintiff's statements during both public comment periods did not elicit any disruption. The audience remained respectful. The public comment periods proceeded apace, with other citizens given the opportunity to speak. And the Council's intervening agenda items were addressed without incident.

Cognizant of the lack of actual disruption, the City argues that the Mayor and the Council determined that the proceedings were "at risk" of a "disruption of the orderly and fair progress of discussion." (Dkt. 5 at 9, 10). But *Steinburg* requires that silencing a speaker must be based on the presiding official's *reasonable* perception of disruption, not mere speculation. 527 F.3d at 385, 390. "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression"; there must be "a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 255 (4th Cir. 2003) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969)). On these facts, the Court concludes that silencing Plaintiff was not connected to any reasonable concern of disruption. In fact, it seems far more likely that Plaintiff was silenced because of his message's offensiveness and disagreeableness to the Council.

Other inapplicable justifications from *Steinburg*. The City summarily asserts its group defamation rule is "substantially similar" to the personal attack policy that *Steinburg*. (Dkt. 5 at

---

[17] The City says the Council's actions were proper because Plaintiff disobeyed the Mayor's call to order and protested the vote to remove him. (Hr'g Tr. at 6–7). This contention is circular. The issue here is whether the rule forming the basis of the Mayor's interruption and the Council's vote is constitutional. (*See id.* at 8–9). The government cannot enforce an unconstitutional (and thus void) rule, then use a citizen's refusal to obey the unconstitutional rule as support for its legality. *See Marbury v. Madison*, 5 U.S. 137, 176–77 (1803).

5).  *Reed*, of course, has undermined *Steinburg*'s assessment of content-neutrality.  *See supra* Part VI.B.3.  Moreover, the rule challenged here does not address individuals but groups, a legally significant distinction since the concept of group defamation is even more circumscribed by the First Amendment and Virginia law than defamation of individuals.  *See supra* Part IV.

*Steinburg* justified the personal attack rule on grounds that are inapplicable here.  First, a personal insult not "directed at substantive ideas or procedures *at issue*" is "irrelevant" in the forum, "*unless* of course, the topic *legitimately at issue is the person being attacked*."  *Steinburg*, 527 F.3d at 386–87 (emphasis added).  This is another instance where the breadth of the public comment period is fatal to the rule:  Because Plaintiff could bring any matter to the Council's attention, the interrelated (in Plaintiff's mind) topics of public safety, local immigration, and purported dangers posed by Muslims were relevant.  Plaintiff's (undoubtedly overbroad) statements about Muslims were "legitimately at issue" as part and parcel of his concerns.

Second and similarly, "an insult directed at a person and *not the issues at hand*" will "almost inevitably" devolve into an argument or counter-attack that threatens disruption to the meeting.  *Id*. at 387 (emphasis added).  Again, the breadth of the forum goes to "the issues at hand" and undercuts the regulatory justification in *Steinburg*.

More significantly, divorcing "attacks" on groups from political discourse in a widely opened forum before elected officials is anathema to the First Amendment.   Proponents of a measure criticize—sometimes truthfully, sometimes not—their opponents (and vice versa).  Members of one party deride those of another (with varying degrees of factual accuracy).  Beneficiaries of a policy extol their virtues, while those against the policy might lambast them as undeserving or unworthy.  Yet a city lacks "authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules."  *R.A.V.*, 505 U.S.

33

377, 392. Mechanically applying the regulatory rationales in *Steinburg* to a forum as open as this one would encourage a "persistent and insidious" threat of a "heckler's veto," where "speech assertedly or demonstrably offensive to some elements of the public" is silenced to avoid disruptions. *See Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cty*., 505 U.S. at 134.

## C. The Rule Grants an Impermissible Degree of Discretion.

The wideness of the forum here, the narrowness of group defamation as a legal concept, and the pliability of the group defamation rule also present another First Amendment problem: Unbridled government discretion over speech. *See CEF*, 470 F.3d at 1064.

A "corollary of the prohibition on viewpoint discrimination is the principle that administrators may not possess unfettered discretion to burden or ban speech, because 'without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or view-point of the speaker.'" *Id.* at 1068 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 863–64 (1988)). Boundless rules run the risk that the government will use seemingly innocuous standards in pretextual and censorial ways, "hiding the suppression from public scrutiny." *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006). Thus, the prohibition against unbridled discretion "is a constant in forum analysis," although the inquiry is not a static, acontextual one. *CEF*, 470 F.3d at 1068.

Here, the Council uses the word "'defamation' in a colloquial sense"; the rule is "not being utilized to curb actual defamation, but something more akin to offensive speech." (Dkt. 20-1 at 2; *see* Hr'g Tr. at 34 (City's admission that rule is not guided by legal definition of defamation)). Thus, the Council must instantly decide whether a statement is "defamatory"

34

(based on whatever definition it imports to that term) "and immediately institute a remedy," a process which cannot fairly account for the delicate constitutional safeguards that exist to protect speakers. (Dkt. 20-1 at 3). Instead, the rule turns "upon the *ad hoc* subjective" determinations of the Council. (*Id*. at 12).

The "success of a facial challenge on the grounds that [a rule] delegates overly broad discretion to the decisionmaker rests [on] whether there is anything in the ordinance preventing" it from exercising its discretion in a content-based manner. *Forsyth Cty.*, 505 U.S. at 133 n.10. But nothing so limits the group defamation rule. As discussed above, the rule lends itself to content-based restrictions; it has in fact been inconsistently applied, as the example of Mr. Haden shows; and the Council employs an idiosyncratic understanding of the term "defamation." The lack of constraints on the Council's discretion is also discussed as to the vagueness claim.

## VII.   PLAINTIFF'S OVERBREADTH AND VAGUENESS CLAIMS

Although the City seeks judgment on Plaintiff's overbreadth and vagueness claims, its briefs do not touch upon those subjects. The City cites no vagueness or overbreadth case. It writes, referencing *Steinburg*, that the group defamation rule "is not vague or overbroad . . . because it was adopted and employed to serve the legitimate public interest in a limited form [*sic*] of decorum and order." (Dkt. 5 at 5, 6; *see also* dkt. 11 at 14). But *Steinburg* involved only general First Amendment facial and as-applied challenges, not ones based on overbreadth[18] or vagueness under the Due Process Clause. Hence, the City is not entitled to judgment.

### A.       Overbreadth

The overbreadth doctrine is "a departure from traditional rules of standing" because it permits facially challenges to a statute that threatens third-parties "who desire to engage in

---

[18]      An overbreadth challenge is "a second type of facial challenge" separate and apart from one on general First Amendment grounds. *United States v. Stevens*, 559 U.S. 460, 473 (2010).

legally protected expression but who may refrain from doing so rather than risk prosecution . . .

.” *Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 257 (4th Cir. 2003). A

claimant must show that:

> a regulation's overbreadth is not only . . . real, but substantial as well, judged in
> relation to the [challenged regulation's] plainly legitimate sweep, and also that no
> limiting construction or partial invalidation could remove the seeming threat or
> deterrence to constitutionally protected expression.

*Id.* at 258. There "must be a realistic danger that the statute itself will significantly compromise

recognized First Amendment protections of parties not before the Court . . . ." *United States v.*

*Chappell*, 691 F.3d 388, 395 (4th Cir. 2012).

The "first step in overbreadth analysis is to construe the challenged statute." *United*

*States v. Stevens*, 559 U.S. 460, 474 (2010). There is little to construe: The prohibition on

defamatory attacks on groups is not further defined, and the Court has already explained how

limited the legal concept of "group defamation" is. Speakers are left to guess at how broadly the

rule sweeps, and how the Council will apply it in a given instance.

Ascertaining the rule's "legitimate sweep" is key to the overbreadth analysis. *See*

*Newsom*, 354 F.3d at 258; *Chappell*, 691 F.3d at 396 (4th Cir. 2012) (how substantial the

overbreadth is must be evaluated "relative to the statute's plainly legitimate sweep"). As

explained at length above, the open character of the public comment period places tight limits on

the propriety of the rule: Its only "legitimate" aims are advancing compelling state interests (of

which the City has put forth none) in a narrowly-tailored fashion. Additionally, "group

defamation" as a legal concept is moribund. It garners no special disfavor as a matter of First

Amendment law. And the theory in Virginia (restricted to the "small group exception") is so

narrow that it is little more than individual defamation by other means—the defamed group must

be so small that you can readily identify the specific individual(s) at issue.

36

With a tiny "legitimate sweep," it is easy to conclude that the statute is overbroad. It would countenance prohibiting a wide array of clearly on-topic statements on matters of public concern. Speaking out against ones political opponents or explaining one's position in reference to an unflattering view of a relevant group would all fall within its reach. Take the following examples:

1. Those [favoring/opposing] Ordinance X are scurrilous liars who have deceived you.

2. Republicans opposing the abortion clinic buffer zone are enslaving women.

3. I support the anti-panhandling ordinance because the homeless on John Doe Street are disease-ridden and lazy.

4. Local conservative politicians are racists, sexist monsters who steal from the poor.

5. Local liberal politicians are active members of an international socialist conspiracy to deny citizens their Second Amendment rights.

These statements and innumerable others like them generally would be relevant to the subject matter of the public comment period. Yet all would fall under the Council's ban of "defamatory attacks on groups," just like Plaintiff's statement that Muslims are monstrous maniacs who commit horrible crimes.

### B. Vagueness

Vague laws leave citizens unsure if their actions will transgress a rule; they facilitate arbitrary enforcement based on *ad hoc*, subjective judgments by officials. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982); *see Papachristou v. City of Jacksonville*, 405 U.S. 156, 168 (1972) ("unfettered discretion" presents a vagueness problem). A rule "is unconstitutionally vague if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement.'" *United States v. Saunders*, 828 F.3d

198, 206 (4th Cir. 2016). A "more stringent vagueness test" applies when First Amendment rights are at issue. *Vill. of Hoffman*, 455 U.S. at 498.

Plaintiff lodges the fair notice theory here, observing that both hyperbole and generic group defamation are not actionable in Virginia, and that the Council has no definition or guidelines for applying its rule. (Dkt. 11 at 9). The point has significant force, since the Council apparently is not applying defamation in a legal sense but instead in an undefined, colloquial one. (*See* Hr'g Tr. at 34).

The point also bleeds into the arbitrariness theory of vagueness. As discussed above regarding content and viewpoint discrimination, as well as the unfettered discretion employed regarding the rule, there are substantial risks of arbitrary enforcement based on what the Council deems defamatory or offensive on an *ad hoc* basis. There is also proof of the arbitrary enforcement at the June 20th meeting: One citizen railed against "radical Islamic terrorists" who are "vicious dogs" and "killers," but he—unlike Plaintiff—was allowed to speak freely. *See Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 372 (4th Cir. 2012) ("pattern of unlawful favoritism" shows discriminatory enforcement and thus vagueness). It is also apparent based on the examples in the preceding section that the rule "implicates a substantial amount of constitutionally protected" speech. *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012). Accordingly, the Court concludes that the rule is unconstitutionally vague.

## VIII.  SECTION 12 OF THE VIRGINIA CONSTITUTION

Count Four claims the City violated Plaintiff's rights under the Article I, § 12 of the Virginia Constitution ("Section 12"). The City incorporates its substantive arguments made on the First Amendment claims, but also contends that Section 12 is not self-executing. The City does not cite authority so holding, but points to other, non-self-executing articles in the Virginia

Constitution. (Dkt. 5 at 11).

Section 12 states:

> That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances.[19]

The Supreme Court of Virginia has explained that constitutional provisions in Virginia's Bill of Rights, as well as those which "specifically prohibit particular conduct," are self-executing. *Robb v. Shockoe Slip Found.*, 228 Va. 678, 681–82, 324 S.E.2d 674, 676 (Va. 1985). Section 12 fits both categories: It is part of Virginia's Bill of Rights, and it specifically prohibits abridgment of the freedom of speech and petition. Cases recognize that Section 12 provides an actionable right. *See, e.g., Adams Outdoor Advert. v. City of Newport News*, 236 Va. 370, 370, 387–88, 373 S.E.2d 917, 918, 926–27 (Va. 1988); *Elliott v. Virginia*, 267 Va. 464, 473–74, 593 S.E.2d 263, 269 (Va. 2004). Since Plaintiff's Section 12 rights are coextensive with those under the First Amendment, the City will not receive judgment on Count 4 at this time.[20]

---

[19]    Although Section 12 references laws passed by the General Assembly, Virginia applies Section 12's prohibitions to localities as well. *See, e.g., Adams Outdoor Advert. v. City of Newport News*, 236 Va. 370, 387, 373 S.E.2d 917, 926 (Va. 1988).

[20]    What remedies accompany Section 12, however, is a more nuanced question for a federal court. It is not obvious that damages are recoverable under Virginia law for violations of the Virginia Constitution. Certainly, they are not available pursuant to 42 U.S.C. § 1983, which permits damages from violations of only *federal* rights.

As for injunctive relief premised on the City's transgression of Section 12, the Eleventh Amendment might (or might not) prohibit it. The Eleventh Amendment bars federal court injunctions against *state* officials for violations of *state* law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 117 (1984). *Pennhurst* applied its holding to county officials on the facts of that case, *id*. at 123, but recognized that the Eleventh Amendment bar on state law injunctions might not always extended to localities. *Id*. at n.34; *see Maryland v. Antonelli Creditors' Liquidating Trust*, 123 F.3d 777, 786 (4th Cir. 1997) (doubting in *dicta* whether counties can raise Eleventh Amendment immunity, as it "has long been the law that the Eleventh

Case 3:16-cv-00057-NKM-JCH   Document 28   Filed 11/18/16   Page 39 of 44   Pageid#: 277

## IX.     PRELIMINARY INJUNCTION ANALYSIS

In addition to opposing the City's motion, Plaintiff asks for a preliminary injunction against the group defamation rule. "The decision to issue or deny a preliminary injunction is committed to the sound discretion of the trial court." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013). A preliminary injunction is an extraordinary remedy. *Id.*

The Fourth Circuit requires courts to weigh four factors when considering whether to grant a preliminary injunction:

> (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied, (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest.

*Ciena Corp. v. Jarrard*, 203 F.3d 312, 322 (4th Cir. 2000); *see League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (same). A "high likelihood of harm to a plaintiff may reduce the extent to which that plaintiff must demonstrate a likelihood of success on the merits;" in other words, the plaintiff's burden "varies according to the harm the plaintiff would be likely to suffer absent an injunction." *Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 277 (4th Cir. 2002). Conversely, if the balance of harm weighs equally, a stronger showing of likelihood of success is needed. *Equity in Athletics, Inc. v. U.S. Dep't of Educ.*, 291 F. App'x 517, 521 (4th Cir. 2008).

### A.     Irreparable Harm to Plaintiff

Because Plaintiff has a strong likelihood of success on the merits, his showing of irreparable harm need not be great. *Rivero*, 282 F.3d at 277; *see WV Ass'n of Club Owners &*

---

Amendment does not bar suits in federal court against political subdivisions of the state").

The parties' motions have not raised these remedial issues. The Court will accordingly not rule in favor of their respective motions: The damages claim will not be dismissed as the City would like, and the preliminary injunctive relief granted in this opinion will not be based on Section 12.

*Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ("plaintiff's claimed irreparable harm is inseparably linked to the likelihood of success on the merits of plaintiff's First Amendment claim"). Even without that benefit, Plaintiff can make the requisite showing.

For one, the "Supreme Court has explained that loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Newsom*, 354 F.3d at 261 (internal quotations omitted); *see Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011). Additionally, the Council's actions and ability to censor Plaintiff's speech have made him "reluctant" to speak. (Dkt. 9 ¶ 6). Finally, even though the evidence shows that Plaintiff has continued to speak—for instance, at the July 5, 2016 meeting—the Council still maintains that it will enforce the group defamation rule. As the Council's clerk stated, Plaintiff can still speak during the public comment period "as long" as he follows the Council's rules (dkt. 17 ¶ 7), which include the group defamation ban. The City likewise conceded at oral argument that, if Plaintiff attempted to make the same statement at subsequent public comment periods, he would be cut off. (Hr'g Tr. at 17–19). In sum, the willingness to stand by a likely unconstitutional rule evinces a substantial threat of continued irreparable harm to Plaintiff.

## B. Harm to the Government

The government "is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional." *Newsom*, 354 F.3d at 261; *see Centro Tepeyac*, 722 F.3d at 191; *Legend Night Club*, 637 F.3d at 302. The balance of the harms thus weighs exclusively in Plaintiff's favor.

## C. Likelihood of Success

For the reasons explained regarding the City's motion, the Court concludes that Plaintiff has a high likelihood of success on his First Amendment, overbreadth, and vagueness claims.

**D.      Public Interest**

"Surely, upholding constitutional rights serves the public interest."  *Newsom*, 354 F.3d at 261; *see Legend Night Club*, 637 F.3d at 303.

**E.      Additional Arguments**

The City argues that Plaintiff's request for a preliminary injunction fails to state with particularity the relief it seeks and the grounds thereof.  (Dkt. 15 at 1).  A cursory review of Plaintiff's preliminary injunction motion and brief disproves this contention.  (Dkt. 8; dkt. 11 at 21).  Furthermore, the Court's order will set forth in detail the terms of the injunction in compliance with Federal Rule of Civil Procedure 65(d).

The City also contends that Plaintiff seeks a disfavored mandatory injunction, rather than a prohibitory one.  *See League of Women Voters*, 769 F.3d at 235.  "Whereas mandatory injunctions alter the *status quo*, prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending."  *Id.* at 236.  The *status quo* is "the last uncontested status between the parties which preceded the controversy."  *Id.*

Plaintiff seeks a prohibitory injunction, as he asks "that an injunction issue enjoining the enforcement" of the group defamation rule.  (Dkt. 3 at 5; *see* dkt. 8; dkt. 11 at 23).  Such relief seeks "to prevent irreparable harm" while the case continues.  *League of Women Voters*, 769 F.3d at 236.  Moreover, the last uncontested status between the parties involved Plaintiff being permitted to address the Council on matters of public concern, including those that might cause offense or attack certain groups.  The Council's application of the group defamation rule upset this state of affairs, which a prohibitory injunction would reinstitute to protect Plaintiff's free speech and due procees rights.  The City engages in wordplay when it frames the injunction as mandating or ordering the Council to not "exercis[e] its parliamentary judgement [*sic*] in the use

of the" group defamation rule. (Dkt. 15 at 3). Rather, the injunction is simply prohibiting the Council's enforcement of a likely unconstitutional rule.

## X.       SECURITY FOR AN INJUNCTION

Under Federal Rule of Civil Procedure 65(c), a preliminary injunction may be issued "only if" Plaintiff gives security in the amount the court deems proper to protect the City against costs and damages from an erroneous injunction. In the Fourth Circuit, "the district court retains the discretion to set the bond amount as it sees fit *or waive the security requirement*"; a district court cannot completely gloss over the topic but need only "expressly address the issue of security before allowing any waiver." *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (emphasis added).

Plaintiff asks that the bond requirement be waived or only a nominal bond be required because he is "an ordinary citizen unable to post anything more than a nominal bond," and a bond requirement would "effectively deny access to judicial review." This seems proper under the circumstances, where Plaintiff has a strong case on the merits and the injunction will result in little to no harm to the government. *See Doe v. Pittsylvania Cty., Va.*, 842 F. Supp. 2d 927, 937 (W.D. Va. 2012) (Kiser, J.) (setting bond at $0 where municipality had little likelihood of success and would suffer no harm from injunction). Thus, the Court will waive a bond.

## CONCLUSION

The Court concludes that the City is not entitled to dismissal of the complaint or judgment in its favor. On the other hand, a preliminary injunction against the group defamation rule is warranted because it violates the First and Fourteenth Amendments of the U.S. Constitution.

An appropriate order will issue. The clerk is directed to send a copy of this opinion to

counsel of record and to *pro se* Plaintiff.

Entered this __18th__ day of November, 2016.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE